2014 ND 195

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Jeffrey FETCH, Defendant and Appellant.**

No. 20140129.

Supreme Court of North Dakota.

Oct. 28, 2014.

Christopher M. Redmann (appeared), Assistant Burleigh County State's Attorney and Tessa Vaagen (argued), under the Rule on Limited Practice of Law by Law Students, Bismarck, N.D., for plaintiff and appellee.

Danny L. Herbel, Bismarck, N.D., for defendant and appellant.

KAPSNER, Justice.

[¶ 1] Jeffrey Fetch appeals from a criminal judgment entered on a conditional plea of guilty to driving under the influence of intoxicating liquor, reserving his right to appeal the district court's denial of his motion to suppress evidence. Fetch argues the results of his blood test must

be suppressed because he did not voluntarily consent to the blood draw. Because there is sufficient competent evidence to support the court's decision that Fetch voluntarily consented to the blood test, we affirm the judgment.

I

[¶ 2] On August 3, 2013, Trooper Derek Arndt of the Highway Patrol stopped Fetch for speeding in Bismarck, noticed Fetch exhibited signs of intoxication, and gave Fetch a preliminary breath test which registered .138 percent. Arndt arrested Fetch for driving under the influence, handcuffed him, and placed him in the back seat of the patrol car. Arndt proceeded to inform Fetch of the implied consent advisory:

ARNDT: North Dakota law requires you to submit to a chemical test—

FETCH: Okay.

ARNDT: —to determine whether you're under the influence of alcohol or drugs.

FETCH: No chemical test.

ARNDT: The chemical test is—

FETCH: A urine test?

ARNDT: —a blood test.

FETCH: Okay. I literally—I literally have a phobia of hypodermic needles condition. Trust me.

ARNDT: This is a small—

FETCH: I can't do it. I'll literally—plus, it's been, like, ten minutes, so it's going to be the same test. I'm not going to take a blood test because I can't handle it.

ARNDT: Hear me out, hear me out, okay? Refusal to take the test—

FETCH: Okay.

ARNDT: —as directed by a law enforcement officer—

FETCH: Which is you.

ARNDT: —is a crime punishable—

FETCH: What?

ARNDT: —in the same manner as DUI—

FETCH: What if I have a fear of it?

ARNDT: —and includes being arrested. Doesn't matter.

FETCH: What if I have a fear of it?

ARNDT: So—okay?

FETCH: I have a non-conditional fear of it. Son-of-a-gun.

ARNDT: Okay. Refusal to take the test as directed by a law enforcement officer may result in the revocation of your driver's license for a minimum of 180 days and, potentially, up to three years.

. . . .

FETCH: Okay, so if I—if I negate the blood test, then what happens?

ARNDT: Then you're going to get charged for refusing a test.

FETCH: Okay.

ARNDT: And you're also going to get a license loss for about 180 days.

FETCH: How is it an option if people refuse it and it causes you (indiscernible).

ARNDT: I hear—hey, I—I know what you're saying, but here is what the (indiscernible) give the test—put it this way. If you give the blood test, the suspension period, your first offense, it's going to be short.

FETCH: What's it going to be, though?

ARNDT: 90 days.

FETCH: That's still three months.

ARNDT: But you can get a work permit after 30.

FETCH: For driving?

ARNDT: For refusing the test, you get no work permit and the suspension is twice as long.

FETCH: Okay. So I don't—I—I let you take my blood out of my arm—

ARNDT: Mm-hmm.

FETCH: —and I get a 90–day—I still get a 90–day (indiscernible). Okay. So—can you help me out here a little bit? I'm not a criminal.

ARNDT: I know. Basically, the law says—

FETCH: Okay. Say—say I don't deny the nurse's request—

ARNDT: Okay.

FETCH: —to take my blood—

ARNDT: Yeah.

FETCH: —I get a 90–day minimum?

ARNDT: You'll get a 90 day—you won't be above that one-seven mark, you—you're going to be all right, you're going to be underneath the big one.

. . . .

FETCH: Okay. So if I don't take the test, what's the—what's the offense? I literally—I wouldn't—I would literally take a blood test, but it's been five minutes since you took my breathalyzer and I—I literally hate hypodermic needles. I'll—when she puts it in my arm, I'll pass out, I won't wake up for, like, two days.

ARNDT: If you don't take the test, it would be considered a refusal and you'd be suspended for, I think, a year.

FETCH: On my license for a year?

ARNDT: Tough.

FETCH: Okay. So if I do take it, then what? It's only 90 days, it's only three months?

ARNDT: And you can get a work permit after 30.

FETCH: I can get a work permit after 30 days?

ARNDT: Yeah. (Indiscernible)

FETCH: So I'm losing my license tonight guaranteed?

ARNDT: No (indiscernible) 25 days after that.

FETCH: What the fuck should I do?

ARNDT: I can't give you legal advice, man, but—

FETCH: Okay. So if I don't take it, I'll lose it for a year minimum or maximum?

ARNDT: Are you asking me what I would do?

FETCH: I'm asking for—if I don't take the test, if I refuse the test, do I lose it for a one-year minimum or maximum?

ARNDT: It would be 180–day minimum, but you'd be looking at a year.

FETCH: Half a year.

ARNDT: But you'd be—but you get a 360 day.

[¶ 3] The partial transcript of the traffic stop ends at this point. At the suppression hearing, however, Arndt testified Fetch "ultimately decided that he would take the test," but Arndt could not recall at what point during the encounter Fetch consented. Fetch testified:

Q. Okay. When he told you that if you didn't take it you would be charged with a crime, what was your—what did you think at that point in time?

A. At that point I didn't really think I had an option. It was—I just had to take the test. I didn't feel like I had the right or ability to refuse the test.

. . . .

A. The entire time I didn't feel like I had a choice, because I told him that I did not want to take the test, and I didn't feel like I had a choice. He said that it was a crime if I didn't.

Q. Did you ever say: Yeah, I will take the test, to the nurse or to the trooper?

A. No, I didn't want them to take the blood from me. They—once we got down to the detention office I felt like I had to, so they did draw blood from me, but I didn't really feel like I had an option.

. . . .

A. He just said that it would be a crime that was punishable by law and then we went to the detention center to do a blood test.

The results of the blood test revealed a blood alcohol concentration of .17 percent.

[¶ 4] The district court rejected Fetch's arguments that law enforcement should have obtained a search warrant before requesting him to submit to the blood test, and the implied consent advisory required by N.D.C.C. § 39–20–01(3) caused his consent to be involuntary and coerced.

[T]here is no indication in this case that the defendant was "obviously coerced" into taking the tests requested by the officer. Although it was understandably difficult for Fetch to decide to take the test because of his fear of needles, no facts elicited indicated the officer engaged in any coercive behavior. Fetch voluntarily and freely consented to taking the test, even though he admitted it was something he may not want to do, or it was a difficult choice.

Fetch entered a conditional plea of guilty under N.D.R.Crim.P. 11(a)(2) to driving under the influence of intoxicating liquor in violation of N.D.C.C. § 39–08–01, reserving the right to appeal the court's denial of his suppression motion.

## II

[¶ 5] Fetch argues the result of the blood test should have been suppressed under the Fourth Amendment and N.D. Const. art. I, § 8, because he did not voluntarily consent to the blood draw and

Arndt did not have a search warrant to have the test performed.

[¶ 6] In *State v. Smith*, 2014 ND 152, ¶ 4, 849 N.W.2d 599, we said:

The applicable standard of review of a district court's decision to grant or deny a motion to suppress evidence is well established.

When reviewing a district court's ruling on a motion to suppress, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. We affirm the district court's decision unless we conclude there is insufficient competent evidence to support the decision, or unless the decision goes against the manifest weight of the evidence.

Whether a finding of fact meets a legal standard is a question of law, which is fully reviewable on appeal. The existence of consent is a question of fact to be determined from the totality of the circumstances. Whether consent is voluntary is generally decided from the totality of the circumstances. Our standard of review for a claimed violation of a constitutional right is de novo.

(Citations and quotation marks omitted).

[¶ 7] The administration of breath or blood tests to determine alcohol consumption is a search subject to the warrant requirement, and warrantless searches are unreasonable unless they fall within an exception to the warrant requirement. *See McCoy v. North Dakota Dep't of Transp.*, 2014 ND 119, ¶ 10, 848 N.W.2d 659. In *Missouri v. McNeely*, — U.S. ——, 133 S.Ct. 1552, 1568, 185 L.Ed.2d 696 (2013), the United States Supreme Court held the natural dissipation of alcohol in the bloodstream is not per se exigent circumstances justifying an exception to the warrant requirement for nonconsensual blood testing in all drunk-driving investi-

gations. Consent, however, is another exception to the warrant requirement. *See McCoy*, at ¶ 10.

[¶ 8] There is no question in this case that shortly after Arndt began informing Fetch of the implied consent advisory, Fetch refused to consent to the blood test, as was his right under N.D.C.C. § 39–20–04, because of his fear of hypodermic needles. However, this Court has long recognized that a driver who has refused a chemical test but later changes his mind and consents to the test can cure the prior refusal. *See, e.g., Maisey v. North Dakota Dep't of Transp.*, 2009 ND 191, ¶ 24, 775 N.W.2d 200; *Grosgebauer v. North Dakota Dep't of Transp.*, 2008 ND 75, ¶ 13, 747 N.W.2d 510; *Lund v. Hjelle*, 224 N.W.2d 552, 557 (N.D.1974). That is precisely what occurred in this case. After Fetch initially refused the blood test, he continuously questioned Arndt about the implied consent advisory and the consequences of refusing to take the test. The partial transcript of the traffic stop establishes that Fetch was reconsidering his refusal and weighing his options.

■ [¶ 9] The record further establishes that Fetch eventually consented to the blood test. Arndt testified Fetch "ultimately decided that he would take the test." Although Fetch claims Arndt's inability at the suppression hearing to recall parts of their discourse and the timing of events during the traffic stop and arrest establishes that Arndt gave "false testimony," this was a matter of credibility for the district court to assess. *See, e.g., State v. Zink*, 2010 ND 230, ¶ 11, 791 N.W.2d 161. Indeed, Fetch's testimony at the suppression hearing also establishes that he did consent to a blood test, even though at first he did not want to, because "I didn't really feel like I had an option." Fetch's argument that his consent was involuntary and coerced is based on Arndt informing him about the implied consent advisory and the consequences of a refusal. But we have held that consent to a chemical test is not coerced and is not rendered involuntary merely by a law enforcement officer's reading of the implied consent advisory that accurately informs the arrestee of the consequences for refusal, including the criminal penalty, and presents the arrestee with a choice. *See Smith*, 2014 ND 152, ¶ 16, 849 N.W.2d 599; *see also McCoy*, 2014 ND 119, ¶ 21, 848 N.W.2d 659.

[¶ 10] We conclude there is sufficient competent evidence to support the district court's decision that Fetch voluntarily consented to the blood test, and therefore, the court did not err in denying his motion to suppress.

### III

[¶ 11] It is unnecessary to address other arguments raised because they either are unnecessary to the decision or are without merit. The criminal judgment is affirmed.

[¶ 12] GERALD W. VANDEWALLE, C.J., LISA FAIR McEVERS, DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.